UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

Carol Rego, individually and on behalf of
all others similarly situated,

       Plaintiff,

  vs.

Liberty Mutual Managed Care, LLC,

       Defendant

Case No. 1:17-cv-00066-WCG

---

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

   Defendant Liberty Mutual Managed Care, LLC ("LMMC"), is entitled to summary dismissal of the misclassification claims asserted under the Fair Labor Standards Act ("FLSA") by named-plaintiff Carol Rego and the ten additional individuals who have filed consents to join this matter (collectively, "Plaintiffs"). LMMC submits this Memorandum of Law in support of its Motion for Summary Judgment.

## I.  INTRODUCTION

   Plaintiffs' primary duty as Utilization Management Nurses ("UMNs") at LMMC was to utilize their professional nursing judgment as Registered Nurses ("RNs") to determine whether requests for medical treatment were medically necessary, based upon a review of relevant medical records and clinical guidelines. LMMC requires every UMN to maintain an RN license, because it has determined that these vitally important decisions, and their impact on both patients and LMMC's policy-holders, require the level of medical expertise and experience inherent in RN licensure. As a critical part of their jobs, Plaintiffs exercised professional nursing judgment every time they decided whether a particular medical treatment or procedure requested by a physician or other care provider was necessary and consistent with medical guidelines. These

undisputed facts compel the legal conclusion that the UMN role meets the requirements of both the professional and administrative exemptions to the overtime provisions of the federal Fair Labor Standards Act ("FLSA"). *See* 29 U.S.C. § 213(a). Consistent with the United States Supreme Court's recent direction that these exemptions should be given a "fair reading," *see Encino Motorcars, LLC v. Navarro*, ___ U.S. ___, 138 S. Ct. 1134, 1142 (Apr. 2, 2018), LMMC has presented more than sufficient undisputed evidence to this Court that Plaintiffs' primary duties as UMNs, as well as their manner of compensation, satisfy the professional and administrative exemptions. Consequently, their claims should be dismissed with prejudice.

Alternatively, if the Court finds that a genuine issue of fact exists concerning whether Plaintiffs are exempt from the FLSA's overtime requirements, LMMC requests that the Court grant partial summary judgment and hold that, if Plaintiffs are ultimately found (following trial) to be non-exempt, they are only entitled to one-half of their regular rate for hours worked over the statutory threshold, not "time-and-a-half" as Plaintiffs erroneously insist.

## II.      PROCEDURAL POSTURE

Plaintiff Carol Rego filed the Complaint initiating this civil action on January 17, 2017, alleging that LMMC misclassified her as exempt from overtime under the FLSA when she worked as a UMN. She sought to represent a collective of individuals who had been employed by LMMC as UMNs during the three-year period preceding the filing of the Complaint, pursuant to 29 U.S.C. § 216(b). (Dkt. 1.) LMMC filed its Answer and Affirmative Defenses to the Complaint on February 27, 2017, denying that Rego or any UMN had been improperly classified as exempt from overtime and asserting, among other defenses, that Rego and the UMNs she sought to represent had been properly deemed exempt under the professional and administrative overtime exemptions set forth in Section 13(a)(1) of the FLSA. (Dkt. 6.)

On May 5, 2017, Plaintiff brought a motion for conditional certification seeking approval to send notification of this lawsuit to the collective of current and former UMNs she seeks to represent. (Dkt. 17.) The Court authorized notice to issue to the collective on August 23, 2017. (Dkt. 26.) Notice issued to 70 current and former UMNs. Before notice of this matter issued per the Court's August 23, 2017 Order, two former UMNs and one current UMN filed notice of their consent to join this lawsuit as plaintiffs. (Dkt. 9, 14, 15.) Following distribution of the notice, seven additional individuals filed consent to join this lawsuit as plaintiffs, bringing the total number of collective litigants to 11, or just 15% of the putative class. (Dkt. 27, 28, 29, 31, 34, 35.)

On March 5, 2018, the parties entered into a representative discovery agreement in which they would each select two opt-in Plaintiffs to serve along with Rego as representative for purposes of discovery, and if necessary, a trial (the "Representative Plaintiffs"). (Dkt. 38-1). The parties agreed that the testimony and written discovery related to Rego and the Representative Plaintiffs would be representative of the non-testifying opt-in plaintiffs. (*Id.*) The parties selected the following individuals as the four Representative Plaintiffs: Johnette Devore, Cynthia Jaster, Tara York-Winkler and Tabitha Trisvan.

The parties have completed discovery, including interrogatories, document production, depositions of Rego and the Representative Plaintiffs, and depositions of five LMMC employees. LMMC now seeks summary dismissal of Plaintiffs' claims based on this discovery record.

## III.    STATEMENT OF RELEVANT FACTS

### A.    Rego And The Representative Plaintiffs' Educational Background, Prior Professional Experience, And Employment With LMMC

#### 1.    Carol Rego

Rego obtained her licensure as an RN along with an associate's degree in 1990 and later completed a bachelor's degree in 2000. (Defendant's Statement of Undisputed Material Facts ("SUMF"), ¶ 1.) Between 1990 and 2000, Rego worked as an RN providing direct patient care in clinical settings, such as an intensive care unit, the general medical floor of a hospital, rehabilitative care, triage, and a nursing home. (*Id.*, ¶ 2.) From 2001 to 2010 (when she joined LMMC), Rego worked in a variety of roles in the insurance industry, including seven years reviewing medical records against criteria to determine whether the provision of requested medical services would be approved or denied. (*Id.*, ¶ 3.) Rego was paid a salary and was not overtime eligible in these roles. (*Id.*, ¶ 3.)

Rego began working as a UMN at LMMC in June 2010. (*Id.*, ¶ 16.) Rego worked for LMMC until June 2016, when she voluntarily resigned. (*Id.*, ¶ 16.) During the relevant time period, Rego was paid a weekly salary of at least $1,179.61.  (*Id.*, ¶ 18.)

#### 2.    Tara York-Winkler

York-Winkler received a bachelor's degree in nursing and obtained her RN license in 1985.  (*Id.*, ¶ 4.) Between 1985 and 1995, York-Winkler worked in various hospital settings, including the PACU, where patients recover from anesthetized surgery; the Intensive Care Unit ("ICU"); the Coronary Care Unit, where patients recover from heart surgery; and the nursery. (*Id.*, ¶ 5.) From 1997 to 2007, York-Winkler worked as a nurse in the women and children's services department at a hospital and as a school nurse at an elementary school. (*Id.*, ¶ 5.) York-

Winkler then worked in the insurance industry as a disease case manager from 2008 to 2010. (*Id.*, ¶ 6.)

York-Winkler worked at LMMC as a UMN from July 2007 through June 2008 and again from 2010 until 2016. (*Id.*, ¶ 26.) During the relevant time period, York-Winkler was paid a weekly salary of at least $1,178.81. (*Id.*, ¶ 27.)

### 3. Tabitha Trisvan

Trisvan received a bachelor's degree in nursing and obtained her RN license in 1982. (*Id.*, ¶ 7.) From 1991 until 1999, Trisvan worked in a hospital ICU. (*Id.*, ¶ 8.) From 1996 to 2006, she worked as a subacute nurse manager and as the Director of Nursing at a long-term care facility before she was hired in 2007 as a UMN with LMMC. (*Id.*, ¶ 8.) Trisvan was promoted to Sr. UMN in 2011. (*Id.*, ¶ 19.) She continued in this capacity at LMMC until July 2016. (*Id.*, ¶ 19.) During the relevant time period, Trisvan was paid a weekly salary of at least $1,216.34. (*Id.*, ¶ 20.)

### 4. Johnette Devore

Devore received an associate's degree in nursing and her RN license in 1980, and she has maintained her license since that date. (*Id.*, ¶ 10.) Devore is also a Certified Registered Rehabilitation Nurse. (*Id.*, ¶ 10.) From 1980 to 1994, Devore worked as a nurse in clinical environments, primarily in intensive care nurseries. (*Id.*, ¶ 11.) From approximately 1997 until l999, Devore worked as a staff nurse in an ICU, in clinical patient care. (*Id.*, ¶ 12.) She is currently employed as a Sr. UMN with LMMC and has held UMN or Sr. UMN positions since 1999. (*Id.*, ¶ 21.) She previously worked for Liberty from December 1994 until September 1997 as a case manager. (*Id.*, ¶ 21.) During the relevant time period, Devore has been paid a weekly salary of at least $1,148.56. (*Id.*, ¶ 23.)

### 5. Cynthia Jaster

Jaster has forty-three years of experience as an RN. (*Id.*, ¶ 13.) She obtained a diploma in nursing and her RN license in 1978. (*Id.*, ¶ 14.) Jaster worked in a variety of clinical settings, including hospital ICUs, emergency rooms, and nursing homes, as well as telephonic nursing settings from 1978 to 2004. (*Id.*, ¶ 15.) Jaster joined LMMC in August 2007 as a UMN; she resigned in August 2017. (*Id.*, ¶ 24.) During the relevant time period, Jaster was paid a weekly salary of at least $1,199.04. (*Id.*, ¶ 25.)

### B. The Utilization Management Review Process At LMMC

The Utilization Management ("UM") unit is a separate department within LMMC that conducts "utilization reviews" of treatment requests which are typically submitted by medical providers who are treating employees covered by workers' compensation policies. (*Id.*, ¶¶ 28-29.) The utilization reviews are conducted by UMNs, such as Carol Rego and the Representative Plaintiffs. (*Id.*, ¶ 29.) A utilization review of a patient's medical records and proposed treatment plan is conducted to determine whether the requesting provider's proposed medical treatment is medically necessary. (*Id.*, ¶ 30.) By statute, certain states require that certain requests for medical treatment submitted to a workers' compensation carrier for coverage undergo a utilization review to ensure that the request is medically necessary; other states support utilization review, but do not require it. (*Id.*, ¶ 31.)

The UM unit receives requests for utilization reviews from three primary sources: (1) medical providers submit requests for approval of treatments or procedures before they occur; (2) requests for review of treatments retrospectively to ensure the treatment was medically necessary; and (3) claims adjusters submit internal requests for a recommendation as to whether a requested treatment is medically necessary. (*Id.*, ¶ 32.) Every UMN is responsible for conducting each of these various utilization reviews. (*Id.*, ¶ 29.)

Kristal Reich is the current Manager of the UM unit; she has held this position since April 2015. (*Id.*, ¶ 28.) Five UM Managers report directly to Reich and oversee the UMNs. (*Id.*, ¶ 33.) There are typically 45 to 50 UMNs employed by the UM unit at any given time. (*Id.*, ¶ 33.)

### C.    LMMC Complies With "URAC" Accreditation Standards

The Utilization Review Accreditation Commission ("URAC") is a nonprofit organization that issues accreditations to various types of healthcare businesses focusing on quality and confidentiality. (*Id.*, ¶ 72.) LMMC has been URAC-accredited since at least 1996 and is re-accredited every three years. (*Id.*, ¶ 73.) Some states require URAC accreditation in order to conduct utilization review, and accordingly, accreditation is critical to LMMC's business. (*Id.*, ¶ 74.)

URAC requires companies that conduct utilization reviews to maintain written policies establishing certain core standards, and specific standards relating to workers' compensation utilization management. (*Id.*, ¶ 75.) These standards focus on confidentiality and quality. (*Id.*, ¶ 75.) LMMC establishes its internal policies and procedures related to the utilization management process in order to comply with URAC standards. (*Id.*, ¶ 76.) URAC establishes *minimum* standards for utilization review; in many areas, LMMC imposes stricter or enhanced requirements. (*Id.*, ¶ 77.) For example, while URAC's accreditation requirements permit the use of licensed practical nurses ("LPNs") to perform utilization review, LMMC exceeds this standard by requiring an RN license to perform this function. (*Id.*, ¶ 77.)

### D.    The UMN Position And Its Role In The UM Review Process

UMNs are classified as exempt from overtime and are paid a fixed salary on a bi-weekly basis. (*Id.*, ¶ 34.) The UMN position description indicates that LMMC requires UMNs to have a degree from an "accredited nursing school and [a] current registered nurse license." (*Id.*, ¶ 35.)

LMMC only employs RNs in the UMN position because LMMC wants an RN's "level of clinical expertise and training that's associated with a registered nurse" to render decisions regarding the treatment requests submitted to the UM unit. (*Id.*, ¶ 36.) Since at least 2009, every UMN employed by LMMC has held an active RN license. (*Id.*, ¶ 37.) LMMC also prefers that UMNs have "[t]hree to five years of relevant nursing experience" and that Sr. UMNs have six to eight years of experience, with at least 3 in utilization management settings.[1] (*Id.*, ¶¶ 40-41).

Rego and the Representative Plaintiffs understood that an RN license was a requirement for the UMN position. (*Id.*, ¶ 38.) Rego and each of the Representative Plaintiffs are licensed RNs. (*Id.*, ¶ 39.)

**E.    UMNs Must Use Their Professional Nursing Judgment When Conducting Utilization Reviews**

**1.    LMMC Has Established The Exercise Of Professional Nursing Judgment As A Performance Expectation**

The UMNs' primarily role is to review requests for treatment that are submitted to the UM unit to determine whether the requested treatments are medically necessary. (*Id.*, ¶ 43.) In the examination of every treatment request, UMNs must determine whether they can certify the requested treatment as medically necessary based on the medical records and data provided, or whether the request should be sent to a physician for peer review because the UMN has concluded that the proposed medical treatment is not medically necessary and inconsistent with appropriate guidelines. (*Id.*, ¶ 44.)

---

[1] LMMC sends a small percentage of its utilization reviews out to a third-party vendor. (*Id.*, ¶ 42.) This vendor employs RNs to conduct the review that LMMC outsources. (*Id.*, ¶ 42.) To the extent LMMC has learned that a vendor has allowed a non-RN to review an LMMC file, LMMC has immediately addressed this issue with the vendor to ensure that only RNs review LMMC files. (*Id.*, ¶ 42.)

The UMN job description specifically indicates that UMNs are expected to "utilize[] clinical judgment and critical thinking to determine appropriateness of requested treatment within evidence-based clinical guidelines."[2] (*Id.*, ¶ 45.) The job description further provides that UMNs are expected to gather information and research each treatment request and to "apply[] appropriate clinical guidelines in conjunction with nursing rationale" in determining whether to certify a request or to refer the request for peer review. (*Id.*, ¶ 45.) The job description also provides that UMNs are expected to have the "[a]bility to analyze, interpret and convey technical information" and "[t]echnical knowledge of the theories, principles, practices and techniques of nursing to coordinate medical care." (*Id.*, ¶ 46.) Rego and the Representative Plaintiffs testified that the job description accurately described their role as UMNs. (*Id.*, ¶ 86, 100.)

UMNs can also "negotiate[] with healthcare providers when medical requests exceed criteria and standards, where allowed by law, and identif[y] potential alternatives to promote cost effective clinical outcomes." (*Id.*, ¶¶ 48, 68.) UMNs may also serve on the committee that reviews and updates LMMC's policies and procedures to ensure compliance with accreditation standards. (*Id.*, ¶ 47.) Sr. UMNs also serve as mentors to more junior UMNs by, among other things, providing technical direction with respect to complex treatment requests. (*Id.*, ¶ 48.) Sr. UMNs also participate in quality assurance reviews of files. (*Id.*, ¶ 48.)

LMMC's policies further reiterate that UMNs are expected to "apply nursing judgment based on clinical knowledge in conjunction with the application of approved clinical guidelines and resources." (*Id.*, ¶ 56.) In this context, "nursing judgment" includes "critical clinical decision making" that UMNs learn during their training to become RNs. (*Id.*, ¶ 57.) Nursing judgment

---

[2] Several of the Plaintiffs either copied or paraphrased this language in their resumes. (*Id.*, ¶¶ 85, 99, 112, 118.) Rego explained that when she used the term "nursing rationale" in her resume, she was referencing her education and experience. (*Id.*, ¶ 85.)

also is derived from their experiences in clinical settings. (*Id.*, ¶¶ 56-57.) Rego testified she considered clinical judgment to be "medical judgment" and that critical thinking meant the ability to review and understand medical records and interpret them against the applicable medical guidelines. (*Id.*, ¶ 86.)

### 2. UMNs Consistently Exercise Their Professional Nursing Judgment In The Performance Of Their Job

Once a treatment request is entered into LMMC's computer system called Medical Necessity Review ("MNR"), the program assigns the request to a UMN to conduct the review. (*Id.*, ¶ 50.) Each UMN typically reviews requests from two or three different states. (*Id.*, ¶ 52.) UMNs are expected to complete a review of each of the requests in their MNR queue within the time-period dictated by state law. (*Id.*, ¶ 53.) Each state in which UM reviews are conducted designates a specific hierarchy of medical necessity guidelines to be used for UM reviews in that state. (*Id.*, ¶ 54.) UMNs use these guidelines to assist them in determining whether the treatment requests are medically necessary and appropriate. (*Id.*, ¶ 54.) Once a UMN has an understanding of the treatment requested, the UMN then refers to the state-specific set of guidelines for patient's condition and the type of treatment requested. (*Id.*, ¶ 55.)

These guidelines, as Plaintiffs consistently testified, are "recommendations" that are "not cut in stone" and do not dictate a UMN's decision regarding whether to certify a treatment request. (*Id.*, ¶¶ 62-67.) Heather Karst, a current UM Manager and former UMN, also testified that the guidelines are "based on medical necessity, but you still need a clinical person to be able to interpret those guidelines based on the clinical picture." (*Id.*, ¶ 65.) Every patient presents with his or her own physical profile, medical history, and current diagnosis or condition.

For example, the Massachusetts Guidelines specifically provide:

> The guideline is not intended to substitute for appropriate medical judgement, and is therefore written to be broad enough to allow for a wide range of diagnostic and

treatment modalities and to purposely allow for philosophical and practice differences between various licensed, multi-disciplinary health care practitioners that provide care to injured workers . . . It is expected that approximately ten percent (10%) of cases may fall outside of this guideline and may be reviewed and approved on a case by case basis.

(*Id.*, ¶ 59.) Similarly, the Colorado guidelines provide: "The Division recognizes that acceptable medical practice may include deviations from these guidelines, as individual cases dictate." (*Id.*, ¶ 61.)

UMNs are expected to review the medical records provided, analyze the applicable guideline, and exercise their professional nursing judgment to make a decision as to whether the requested treatment can be certified or whether it should be referred to another physician for review. (*Id.*, ¶¶ 54-56, 69.) Karst further testified that UMNs should be "reviewing the medical records and looking at the treatment requests and the guideline that applies to form their nursing rationale and clinical judgment." (*Id.*, ¶ 70.) UMNs are expected to identify the specific portions of the applicable guidelines that support their decisions either to certify a request or to send it out for peer review in their written rationales documenting their decisions. (*Id.*, ¶ 70.)

The Representative Plaintiffs admitted in deposition that they did, in fact, utilize their professional nursing judgment when analyzing medical records and guidelines to decide whether a treatment request should be certified or referred to a physician for further review. (*Id.*, ¶¶ 87, 96-97, 105, 109-111, 114-116, 120-126.) Plaintiffs further admitted that they exercised their professional judgment when determining which portions of the medical records and applicable guidelines to include in their written rationale. (*Id.*, ¶¶ 91, 93, 95-96, 101-102, 105, 117, 126.) For example:

- Rego admitted that she utilized her professional nursing judgment to refer a treatment request for a knee scooter to peer review because the medical records reflected that the patient was on crutches and did not have any instability. (*Id.*, ¶ 94.) Rego also testified that she decided she could not certify a request for an MRI because physical therapy had not been completed and because there appeared to be conflicting information in

the records "between the symptoms the patient is having and the examination." (*Id.*, ¶ 95.) Rego made this determination based on past nursing experience with similar treatment requests and her nursing training. (*Id.*, ¶ 95.)

- When asked how she came to the decision to refer a request for 80 hours of a functional restoration program for the lower back to peer review, Devore testified that she spent at least an hour reviewing an extensive amount of medical records and provided a detailed description of her method for reviewing the medical records, including what specific pieces of information she was looking for in the records, and used her professional nursing judgment to determine that she could not certify the requested treatment based on the applicable guideline. (*Id.*, ¶ 108.)

- When asked to explain her rationale for referring a request for a spinal steroid injection to peer review, Jaster provided a detailed medical explanation of the request, the possible outcomes of such a treatment, the factors she considered when researching the claim (*e.g.*, the patient's age, the cause of the injury, other conservative treatment options, other possible causes of pain), to support her conclusion that the requested steroid injection would likely not make any difference for the patient. (*Id.*, ¶ 124.) Jaster testified that it took her several hours to synthesize the medical records related to the request to get a clear picture of what was going on with that particular patient, and that she might have had to call the requesting provider to obtain additional medical records. (*Id.*, ¶ 124.) When asked to explain her rationale for referring another request for spinal injections to peer review, Jaster explained that the requesting physician had requested the injections on the wrong side of the body and that she had potentially saved the treating physician from a malpractice claim. (*Id.*, ¶ 126.)

UMNs can use their nursing judgment to certify treatment requests that fall <u>outside</u> the recommendations of the applicable guidelines, and Plaintiffs admitted that they did so. (*Id.*, ¶ 66, 93, 101.) For example, if a guideline only recommends two months of massage therapy but the requested treatment is for three months, a UMN may exercise her clinical judgment to determine whether three months of treatment may be appropriate (in consideration of the patient's physical condition, age, or other factors) and medically necessary and certify the request. (*Id.*, ¶ 66.) Rego explained that she applied her nursing rationale to certify a treatment for a patient under 40 years old when an applicable guideline only recommended that treatment for someone over 40. (*Id.*, ¶ 93.) Trisvan admitted also that she could use her discretion to certify requests for physical

therapy, even if those requests exceeded guideline recommendations, if she determined it was appropriate to do so. (*Id.*, ¶ 113.)

UMNs also use their clinical judgment to certify treatment requests when medical information or data recommended by the applicable guideline, such as an X-Ray, is missing from the file. (*Id.*, ¶ 67.) UMNs exercise their nursing judgment and refer requests for peer review if they identify potential red flags or issues that are not contemplated by the guideline, even if the request otherwise satisfies the applicable guideline's requirements. (*Id.*, ¶ 63.) Trisvan testified, for example, that she could refer requests for physical therapy to peer review if she determined that the requested physical therapy might not be necessary based on factors such as the patient's prior treatment. (*Id.*, ¶ 114.)

Consistent with the law in certain states, UMNs may contact the requesting providers and ask the providers to modify their requests, after considering the relevant guidelines. (*Id.*, ¶ 68.) UMNs rely on their judgment and discretion to determine whether to negotiate a modification with the requesting provider in these circumstances. (*Id.*, ¶ 68.) UMNs may also need to contact the provider for additional information or records if they determine more information is needed to review the request. (*Id.*, ¶ 22.) Plaintiffs admitted that they did, in fact, exercise their professional judgment to contact providers to obtain additional information and to negotiate modifications to treatment requests when they determined it was appropriate to do so. (*Id.*, ¶¶ 99, 112, 119.)

### 3. UMNs' Performance Is Evaluated Based Upon Their Effective Exercise of Professional Nursing Judgment

Plaintiffs admitted that their performance was evaluated, in part, on their application of clinical nursing judgment to their reviews. (*Id.*, ¶¶ 104, 121.) Several Plaintiffs received positive comments from their managers regarding their application of professional nursing judgment to

the treatment requests they reviewed. (*Id.*, ¶¶ 105, 116-117, 122.) For example, in one of her performance reviews, Devore's manager commented that she "consistently applies good clinical nurse judgment to review activities and renders appropriate UMN decisions[.]" (*Id.*, ¶ 105.) Trisvan was also commended for referring treatment requests to peer review when "she questions the appropriateness of the request based on her clinical background." (*Id.*, ¶ 117.) Similarly, York-Winkler received praise for "demonstrat[ing] good clinical judgment in her UM reviews. She follows guideline recommendations and understands the complexities of WC injury management and treatment." (*Id.*, ¶ 122.)

### F. LMMC Conducts Limited Oversight and Review of UMNs' Decisions

Many UMNs, including Rego and each of the Representative Plaintiffs, work out of home offices and are not closely supervised on a day-to-day basis. (*Id.*, ¶ 17, 19, 22, 24, 26, 49.) To the extent she sought input from her managers, Trisvan testified that when she went to her managers for input regarding particular files, her managers typically followed her recommendation with respect to whether a request for treatment should be certified or sent out to peer review, with rare exceptions. (*Id.*, ¶ 115.)

LMMC conducts limited quality assurance audits in order to comply with URAC standards and to drive continuous improvement within the UM unit. (*Id.*, ¶ 80.) Less than five percent of the UMNs' reviews are subjected to quality assurance reviews. (*Id.*, ¶ 83.) If a UMN's review receives a negative quality assurance review, that UMN's manager would use the negative review as a coaching opportunity. (*Id.*, ¶ 84.) For example, Devore testified that she was coached on one occasion when her manager disagreed with her decision to follow the guidelines and thought she should have certified a request. (*Id.*, ¶ 103.)

### G. Plaintiffs Understood Their Salaries Compensated Them For All Hours Worked

LMMC's employee handbook provides that exempt employees "are paid on a salary basis for the work they perform and are not eligible for overtime pay." (*Id.*, ¶ 127.) The handbook further provides that "[i]t is Company policy to pay exempt employees their full weekly salary for any week in which they perform any work for the Company, without regard to the number of days or hours actually worked[.]" (*Id.*, ¶ 127.) The handbook later reiterates this principle by stating "[b]ecause exempt employees are already compensated for all hours worked, no additional salary payment will be generated as a result of any additional hours entered." (*Id.*, ¶ 127.)

Rego and each of the Representative Plaintiffs testified that they understood that, as UMNs, they were paid a salary for all hours worked during each workweek and they were not eligible for any additional compensation based on the number of hours they worked. (*Id.*, ¶¶ 128-132.)

## IV. LEGAL ARGUMENT

### A. Standard of Review

#### 1. Summary Judgment Is Proper Whenever A Plaintiff Cannot Identify A Genuine Issue Of Material Fact That Would Necessitate A Trial

Summary judgment is proper when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment procedure is an "integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (*quoting* Fed. R. Civ. P. 1). To avoid summary judgment, a plaintiff must demonstrate there is a genuine issue of material fact for each claim. *Id*. at 323-24. A "mere existence of a scintilla of evidence in support of the plaintiff's positon

will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986). If the plaintiff cannot meet her burden of proof, summary judgment is always proper. *See Celotex Corp*., 477 U.S. at 322-24.

The determination of whether an employee falls within the scope of an FLSA exemption is ultimately a legal question, and is, therefore, "amenable to resolution in a motion for summary judgment." *McKinney v. Med Grp. Transp. LLC,* 988 F. Supp. 2d 993, 1000 (E.D. Wis. 2013); *see also, Roe-Midgett v. CC Services, Inc.,* 512 F.3d 865, 869 (7th Cir. 2008); *Friedman v. Natl. Indem. Co*., 8:16-CV-258, 2018 WL 1954218, at *2 (D. Neb. Apr. 13, 2018) (finding that with the holding in *Encino Motorcars, LLC v. Navarro*, ___ U.S. ___, 138 S. Ct. 1134, 1142 (Apr. 2, 2018), in mind, employees were exempt as a matter of law). These principles apply just as readily in collective actions. *See, e.g., Pope v. Espeseth, Inc.*, 228 F. Supp. 3d 884, 888 (W.D. Wis. 2017); *Ricard v. KBK Servs*., No. 15-cv-299-jdp, 2016 WL 4691608, at *7 (W.D. Wis. Sep. 7, 2016) (granting summary judgment for defendant after collective action was conditionally certified).

### 2. The FLSA Exemptions Should Be Given a Fair Interpretation, Not Narrowly Construed Against The Employer

Recently, in *Encino Motorcars, LLC v. Navarro*, the Supreme Court explicitly rejected the oft-cited principle that exemptions to the FLSA should be construed narrowly. 138 S. Ct. at 1142. *Navarro* noted that the overtime exemptions "are as much a part of the FLSA's purpose as the overtime-pay requirement and specifically held that "there is no reason to give [the FLSA exemptions] anything other than *a fair (rather than a 'narrow') interpretation*" and that there is "no license to give the exemption anything other than *a fair reading*." *Id.* (emphasis added and internal citation and quotations omitted).

Consistent with *Navarro*, therefore, LMMC need only demonstrate that Plaintiffs were properly considered exempt professional and/or administrative employees under a "fair (rather than a 'narrow') interpretation" of the professional and/or administrative exemptions. *See id.; Perry v. Randstad Gen. Partner (US) LLC,* 14-11240, 2018 WL 2363979, at *3 (E.D. Mich. May 24, 2018). LMMC has met this burden and, as further explained below, the Court should grant this motion as a result.

### B. LMMC Properly Classified Plaintiffs As Exempt Under The FLSA

#### 1. Plaintiffs Meet The "Salary Basis" Requirement Of The Professional And Administrative Exemptions

To be classified as exempt from overtime under either the FLSA's professional and/or administrative exemption, an employee must be compensated on a salary or fee basis at not less than $455 per week. 29 C.F.R. §§ 541.200(a)(1), 541.300(a)(1).[3] An employee will be considered paid on a "salary basis" if the employee "regularly receives each pay period . . . a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of work performed." *Id*. at § 541.602(a).

The evidence shows that all Plaintiffs were paid over $1,100 per week at all relevant times. Accordingly, they were paid well in excess of the $455 per week minimum required by the FLSA's exemptions. *See id*. at § 541.600(b). Accordingly, Plaintiffs' compensation satisfies the salary basis test established under the professional and administrative exemption regulations.

---

[3] Citations to the FLSA implementing regulations, 29 C.F.R. §§ 541.200, 541.300, and 541.600, herein, refer to those provisions as they existed prior to the Department of Labor's Final Rule described at 81 Fed. Reg. 32,391. In *State of Nevada, et al v. United States Department of Labor,* 218 F.Supp.3d 520 (E.D. Tex. Nov. 22, 2016), the court enjoined the Final Rule.

## 2. Plaintiffs Satisfy The Learned Professional Exemption's Duties Test

To qualify for the professional exemption, these duties-based requirements must also be met: (1) the employee's primary duty must be the performance of work requiring advanced knowledge; (2) the advanced knowledge must be in a field of science or learning; and (3) the advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction. 29 C.F.R. § 541.301(a).

### a. UMNs' Primary Duty Is The Performance Of Work Requiring Advanced Knowledge

In order for work to be an employee's "primary duty" it must be the "principal, main, major, or most important duty" that the employee performs. 29 C.F.R. § 541.700(a). An employee's performance of work requires "advanced knowledge" if the work "is predominantly intellectual in character" and uses "the consistent exercise of discretion and judgment."[4] 29 C.F.R. § 541.301(b). "An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances." *Id.*

By regulation, the United States Department of Labor ("DOL") has specifically recognized that "[r]egistered nurses who are registered by the appropriate State examining board generally meet the duties requirements for the learned professional exemption." 29 C.F.R. § 541.301(e)(2). It is undisputed that LMMC has required an RN licensure for the UMN role since at least 2009, and that each of the Plaintiffs maintained an RN license. The fact that each

---

[4] "[I]mportantly, the Secretary of Labor has recognized that the discretion and judgment standard for the professional exemption is 'less stringent' than the discretion and independent judgment standard of the administrative exemption." *Pippins v. KPMG LLP*, No. 13-889-CV, 2014 WL 3583899, at *5 (2d Cir. Jul. 22, 2014) (internal citation omitted). "[T]he professional exemption is characterized by 'application of special knowledge or talents with judgment and discretion.'" *Id.* (internal citation omitted). The "learned professions exemption applies if workers rely on advanced knowledge of their specialty to exercise discretion and judgment that is characteristic of their field of intellectual endeavor." *Id.*, at *7.

Plaintiff holds an RN license, and that LMMC specifically *requires* an RN license to work as a UMN strongly supports the conclusion that Plaintiffs met the duties requirement of the learned professional exemption. *See Crowe v. ExamWorks, Inc.*, 136 F.Supp.3d 16, 29 (D. Mass. 2015) (citing *Rieve v. Coventry Health Care, Inc.*, 870 F. Supp. 2d 856, 863 (C.D. Cal. 2012)). A "fair reading" of the DOL's *express* exemption of RNs under the professional exemption can lead to only one conclusion here: LMMC's UMNs are properly classified as exempt.

The undisputed facts further establish that Plaintiffs' primary duty requires the exercise of advanced nursing knowledge and judgment. It is undisputed that the Plaintiffs' primary duty was to perform utilization reviews of treatment requests submitted to the UM unit. This involved Plaintiffs understanding the treatment requested, identifying an applicable clinical guideline, analyzing the medical records related to the request to determine whether the requested treatment was medically necessary, considering the patient's complete clinical profile, and then documenting their rationale for either certifying or referring the request to peer review within the MNR system. It is also undisputed that UMNs performed these duties with minimal supervision. In *Crowe*, the district court held that employees performing a nearly identical utilization review function met the learned professional exemption's duties requirements. *See* 136 F. Supp. 2d at 30-31. *Crowe* specifically held that the plaintiffs "employ advanced, technical knowledge in the medical field to exercise independent judgment in determining whether a particular treatment request for a particular patient satisfied the applicable guidelines." *Id.* at 31.[5]

---

[5] *See also Withrow v. Sedgwick Claims Mgmt. Serv.*, 841 F. Supp. 2d 972, 986-87 (D. W. Va. 2012) (finding that a RN conducting utilization review "used her advanced knowledge to consistently exercise judgment in determining whether a treatment requested by a claimant was related to the compensable injury" and "used her discretion to decide whether a particular request required an independent medical evaluation."); *Rieve*, 870 F. Supp. 2d at 860 (conducting analysis under the FLSA and concluding that a nurse who assessed whether medical care was appropriate but could not modify treatments and who used a manual to complete her duties

Like every plaintiff in an FLSA misclassification case, Plaintiffs will attempt to diminish their role in order to be considered overtime-eligible. They will argue that the clinical guidelines left no room for Plaintiffs to exercise professional judgment to determine whether a treatment was medically necessary. This argument ignores the fact that UMNs must interpret *how* the clinical guidelines apply to an individual patient's medical records in order to determine whether the requested treatment is appropriate for that particular individual. *See Crowe*, 136 F. Supp. 2d at 32-33. *Crowe* specifically rejected Plaintiffs' anticipated argument, noting that it:

> collapses an important distinction between the rule and the person who applies it. It is analogous to saying that the law decides what the outcome of a case should be, and therefore judges cannot be said to have discretion in applying the law to particular cases. But lawyers and judges are tasked with interpreting the law, assessing its application on a case-by-case basis, and reaching individualized determinations. The process in which [plaintiffs] engage is not different in kind.

*Id*.

The fact that Plaintiffs exercised their professional nursing judgment when interpreting clinical guidelines is further illustrated by Plaintiffs' frank admissions that they certified treatments that went *beyond* what was recommended in the guidelines if they determined it was appropriate to do so. Plaintiffs also had the ability to refer a requested treatment to peer review, even if the requested treatment was within guideline recommendations, if Plaintiffs identified factors that they believed rendered the treatment unnecessary. Finally, in some states Plaintiffs had the ability to negotiate (and then certify) treatment requests with requesting to providers. Plaintiffs' ability to depart from the guidelines in some cases and to negotiate treatment plans in

---

exercised the requisite advanced knowledge in her role such that she should "be afforded the same treatment under the law as registered nurses engaged in the practice of nursing."); *Powell v. Am. Red. Cross*, 518 F. Supp. 2d 24, 27-28 (D.D.C. 2007) (finding that an RN who "collected and reviewed medical records for individuals being deployed to determine whether the individual met the medical requirements for deployment under the applicable military guidelines" used "her advanced knowledge as a registered nurse in making these important determinations" based "on the technical, medical nature of both the records and the guidelines involved.").

others illustrates that the guidelines, as Jaster stated, are "not set in stone" and that Plaintiffs, therefore, had to exercise their professional nursing judgment to analyze each patient's medical records and apply the clinical guidelines in each individual case. *See Crowe*, 136 F. Supp. 2d at 32-33; *see also McAllister v. Transamerica Occidental Life Ins. Co*., 325 F.3d 997, 1001-02 (8th Cir. 2003) (rejecting argument that claims examiner did not exercise discretion because she had to follow state law and holding that the interpretation and application of insurance statutes was itself an exercise of judgment and discretion).

Notably, in *Crowe*, District Judge Woodlock specifically examined the Massachusetts Treatment Guidelines, discussed above, and stated he was "satisfied that they require the plaintiffs to make judgments using their medical knowledge to determine whether a particular treatment is medically necessary" noting that the "Guidelines entrust both health care providers and those engaged in utilization review with 'taking into account that appropriate care may vary on a case by case basis." *Crowe*, 135 F. Sup. 3d at 33 (quoting 452 Mass. Code Regs 6.06(2)). Judge Woodlock went on to note that the "Massachusetts Office of Health Policy emphasizes in its guidance on the Guidelines that it provides 'guidelines not mandates' and that it is up to the [nurse] to provide 'the clinical rationale to support the determination.'" *See id.* (quoting 452 Mass. Code. Regs. 6.04(5)). As discussed above, the Colorado guidelines contain similar disclaimers. Clearly, as Judge Woodlock noted, the guidelines themselves explain that a medical professional must interpret them and apply them to each individual case. As a result, because UMNs utilized these guidelines, they exercised their professional nursing judgment when doing so. *See id*.

Plaintiffs will also argue that UMNs do not exercise the requisite level of discretion because they cannot outright deny a treatment request. But this argument ignores a fundamental

aspect of exemption analysis that recognizes that an employee need not be a "final decision-maker" in order to exercise judgment and discretion. *See* 29 C.F.R. § 541.202(c) ("employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action."). Consistent with this principle, *Crowe* roundly rejected this argument in the context of the UMN role, noting that the nurses:

> have two choices: they may approve the request or refer it for peer review by a physician in the same specialty. This determination to approve or refer for further review requires an exercise of discretion and judgment. That the ultimate decision-making authority is held by someone else does not strip the plaintiffs of using their own judgment to issue a recommendation.

*Id.* at 33-34; *see also Rieve*, 870 F. Supp. 2d at 860, 864 (finding nurse to be exempt despite the fact that the nurse "did not have the power to eliminate unnecessary treatment."). The fact that, ultimately, a physician must be consulted if a course of treatment is to be altered does nothing to diminish the role that a UMN plays in the consideration of whether a particular treatment modality is consistent with medical necessity.

      **b.**    **The UMN Position Requires Advanced Knowledge In A Field Of Science That Is Customarily Acquired By A Prolonged Course Of Specialized Intellectual Instruction.**

As noted above, the DOL specifically recognizes that RNs generally satisfy the duties element of the learned professional exemption. *See* 29 CFR 541.301(e)(2). As the *Powell* court correctly recognized, this provision makes clear, at a minimum, that "a registered nurse . . . possesses advanced knowledge . . . in a field of science of a type that must be customarily acquired by a prolonged course of specialized intellectual instruction, satisfying the second and third element of the primary duty test." 518 F. Supp. 2d at 39 (internal quotes omitted); *see also Rieve*, 870 F. Supp. 2d at 864-66 (same).

A court should look to the minimum requirements of a position to determine whether a course of prolonged instruction is needed to acquire the advanced knowledge needed for the job. *See Crowe*, 136 F. Supp. 3d at 35. It is undisputed that LMMC has required RN licensure for the UMN position since at least 2009 and that all UMNs, including Rego and the Representative Plaintiffs, hold an RN license. LMMC employs only RNs in the UMN position because LMMC wants employees with the "level of clinical expertise and training that's associated with a registered nurse" to render decisions regarding utilization reviews. (*Id.*, ¶ 36.) As the *Crowe* court recognized, if a company requires an RN license for a position, then the position unquestionably requires the requisite advanced knowledge to satisfy the learned professional exemption. *See Crowe*, 125 F. Supp. 3d at 34-35; *see also Rieve*, 870 F. Supp. 2d at 862 (advanced knowledge RN possesses is acquired by a "prolonged course of specialized instruction"); *Powell*, 518 F. Supp. 2d at 39 (noting absence of cases finding that a RN does not satisfy duty test); *Hicks v. Great Lakes Home Health Services, Inc*., 17-CV-12674, 2018 WL 2363959, at *5 (E.D. Mich. May 24, 2018) (finding that "[t]here is no dispute that [plaintiff] satisfies the duties prong because she is a registered nurse.").

Plaintiffs will insist that they should be overtime eligible because *other* employers engage non-RNs in similar roles. But LMMC's mandated requirement of RN licensure easily distinguishes this case from others where courts have denied summary judgment because the employer did *not* require an RN license. *See, e.g., Clark v. Centene Co. of Tex., L.P*., 656 Fed. App'x 688, 690 (5th Cir. 2016) (upholding denial of summary judgment when employer allowed licensed vocational nurses to hold the position at issue); *Crowe*, 136 F.Supp.3d at 35 (denying summary judgment because employer did not require RN licensure). The mere fact that *other* employers choose to employ LPNs or other employees who do not have RN licenses to perform

utilization reviews does not mean that LMMC cannot purposefully elect to employ only professionals with a certain level of judgment and experience. LMMC has determined that only RNs have the relevant level of training and expertise to perform utilization reviews. Plaintiffs cannot rely on the choices of other employers with different service models to argue in support of their overtime claims. Because LMMC *requires* employees in the UMN and Sr. UMN positions to hold valid RN licenses, its UMNs satisfy the second and third prongs of the learned professional exemption. *See e.g., Crowe*, 125 F. Supp. 3d at 34-35; *Rieve*, 870 F. Supp. 2d at 862; *Powell*, 518 F. Supp. 2d at 39; *Hicks*, 2018 WL 2363959, at *5.

### 3. Plaintiffs Also Satisfy The Administrative Exemption's Duties Test

The UMNs are also properly classified as exempt under the FLSA's administrative exemption. To qualify for the administrative exemption (in addition to meeting the salary basis test): (1) the employee's primary duty must consist of the performance of office or non-manual work that is directly related to the management or general business operations of the employer or the employer's customers; and (2) the employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a)(2)-(3).

### a. The UMNs' Primary Duty Consists Of The Performance Of Office Or Non-Manual Work Directly Related To The General Business Operations of LMMC's Customers

The phrase "directly related to the management or general business operations" refers to the "type of work performed by the employee." 29 C.F.R. § 541.201(a). In other words, the focus of this analysis is on the employee's duties rather than the characterization of the employer's business. *See id.* The regulations provide that such work is "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." *Id.* The

regulations specifically identify "insurance," "safety and health," "legal and regulatory compliance" and "employee benefits" as areas related to "management or general business operations." *Id.* at § 541.201(b). The regulations further provide that the management or general business operations at issue may be those of LMMC or LMMC's customers. *Id.* at § 541.201(c).

As discussed above, the UMNs' primary duty is to conduct utilization reviews for treatment requests submitted under LMMC's customers' workers' compensation insurance policies, which is a benefit provided to LMMC's customers' employees. As a result, the UMNs' primary duty is directly related to LMMC's customers' management of their employees' safety and health and benefits, as well as their own regulatory compliance with workers' compensation law and insurance. *See id.* at §§ 541.201(b), 541.201(c).

Courts routinely find that employees performing work similar to the UMNs' work satisfy the second element of the duties test for the administrative exemption. *See e.g., Roe-Midgett*, 512 F.3d at 871-872 (holding insurance claims adjusters employed by a third party administrator satisfied the administrative exemption and performed work "directly related" to their employer's clients because they "serviced" the general business operations of their employer's clients); *Withrow*, 841 F. Supp. 2d at 980 (relying on the Seventh Circuit's decision in *Roe-Midgett* and holding claims adjuster employed by third-party administrator of workers' compensation claims satisfied the administrative exemption because employee provided administrative services related to administering workers' compensation claims). As in *Roe-Midgett* and *Withrow*, the UMNs' primary duty is directly related to the administrative operations of LMMC and LMMC's customers.

### b. Plaintiffs' Primary Duty Required The Exercise Of Discretion And Independent Judgment

The UMNs' primary duty [6] – conducting utilization reviews of requested medical treatment – also required the exercise of the requisite level of discretion and independent judgment to satisfy the administrative exemption. The administrative exemption's requirement of "independent" judgment does not require that decisions made by Plaintiffs "have a finality that goes with unlimited authority and a complete absence of review." *Id*. at § 202(c). Rather:

> [t]he decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. ***The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment.***

*Id*. (emphasis added). The *Rieve* court, in analyzing the position similar to LMMC's UMN position held that:

> even though Plaintiff existed in a hierarchy, she was clearly still required to exercise independent judgment and discretion in the course of her duties. Like a registered nurse in practice, she interacted with physicians and patients and provided skilled advice, despite the fact that she did not have the authority to order or alter any course of treatment herself.

870 F. Supp.2d at 864-65.

---

[6] Work that is "directly and closely related" to the performance of exempt work is also considered exempt work. 29 C.F.R. § 541.703(a). The phrase "directly and closely related" means tasks that are related to exempt duties and that contribute to or facilitate performance of exempt work. *Id.* Thus, "directly and closely related" work may include physical tasks and menial tasks that arise out of exempt duties, and the routine work without which the exempt employee's exempt work cannot be performed properly. *Id.* (listing as examples, "recordkeeping; monitoring and adjusting machinery; taking notes; using the computer to create documents or presentations; opening the mail for the purpose of reading it and making decisions; and using a photocopier or fax machine"); *see also Roe-Midgett*, 512 F.3d at 875-76 (holding that damage appraisers exercised discretion and independent judgment where they performed administrative duties associated with adjusting insurance claims). Any administrative work UMNs perform is directly related to their primary duty of conducting utilization reviews, and, therefore also qualifies as exempt work.

As in *Rieve*, and as discussed in detail above, the UMNs exercise discretion and independent judgment when conducting utilization reviews by analyzing medical records and clinical guidelines and using their professional nursing judgment to determine whether the requested medical treatments were necessary. Plaintiffs exercised broad discretion with respect to whether to certify treatment requests (even if those requests were outside the guidelines' recommendations) and were subjected to minimal oversight from the supervisors and through LMMC's quality assurance reviews. *See id.*

In their effort to diminish their role as UMNs, Plaintiffs will argue that they did not exercise independent judgment because they were constrained by LMMC's policies and procedures (largely premised on URAC requirements) when performing utilization reviews. Courts have appropriately rejected this line of argument with respect to similar positions. For example, in *Locke v. American Bankers Insurance Company of Florida*, the court found that insurance claims adjusters satisfied the duties test for the administrative exemption even where the adjusters had to follow their employer's detailed policies. 1:12-CV-01430-MJS, 2014 WL 2091346, at *11 (E.D. Cal. May 19, 2014) (emphasis added). The *Locke* court specifically reasoned that:

> adherence to policy the company believes is prudent cannot mean that no employee who follows the policy can be said to exercise discretion and independent judgment on matters of significance. No, the test is whether they do in fact exercise such discretion and judgment regardless of how detailed and regimented the path may be for getting to the point where they can and do exercise that discretion and judgment.

> Here, the Court agrees that the "guidelines" and "requirements" at issue provide direction to a conclusion and require use of a software program to produce the final number. However, these aids do not remove Plaintiffs' independent judgment in the initial investigative stages. Plaintiffs are called upon . . . to make decisions based on experience and training. Rather than automate the process . . . Defendant has elected to employ, pay and rely on Plaintiffs, apparently based on their years of experience and judgment in resolving claims.

. . .

[Plaintiff] has the ultimate responsibility to gather the facts and put them all together and either determine or make a recommendation . . . .

*Id.*

Similar to the insurance claims adjusters in *Locke*, LMMC has made the decision to rely on RNs to make decisions regarding utilization reviews because of their advanced medical knowledge and years of experience. *Id.* As recognized in *Locke*, LMMC's reliance on Plaintiffs' expertise and experience concerning decisions regarding the necessity of medical treatments establishes that LMMC requires Plaintiffs to exercise discretion and independent judgment when conducting utilization reviews. *Id.* Plaintiffs were not simply reading charts, referencing guidelines, and checking boxes. UMNs *must* exercise discretion and independent judgment when performing their primary duty of conducting utilization reviews, in the best interests of LMMC's policy-holders and their employees.

### c. The Discretion And Independent Judgment Exercised By Plaintiffs Concerns Matters of Significance

Finally, UMNs exercise their discretion and independent judgment with respect to "matters of significance." 29 C.F.R. §541.200(a)(3). "The term 'matters of significance' refers to the level of importance or consequence of the work performed." *Id.* at § 541.202(a).

The UMNs' decisions in conducting utilization reviews unquestionably impact matters of significance to LMMC, its customers, and their injured employees. Whether a treatment request is certified or referred to peer review (and potentially denied) has a significant impact on LMMC's customers' employees' safety, health, and benefits. The UMNs' decisions impact whether LMMC's customers' employees will receive medical treatment requested by their medical providers. Additionally, UMNs' decisions have a significant impact on LMMC and its

customers' compliance with legal and regulatory requirements pertaining to utilization management. Plaintiffs cannot reasonably argue otherwise.

C. **The Measure Of Potential Overtime Damages Should Be Limited To A "Half-Time" Premium**

The United States Supreme Court and the United States Court of Appeals for the Seventh Circuit have adopted the half-time method to calculate unpaid overtime premiums for misclassified salaried employees. *See Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 580 (1942); *Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 670-71, 681-83 (7th Cir. 2010).[7] In *Missel*, the Supreme Court held that absent an agreement adopting a specific hourly rate for an employee, the regular rate of pay for a salaried employee is the fixed weekly wage divided by the number of hours actually worked in that week, including overtime hours. 316 U.S. at 580 n. 16. Once the regular rate is determined for a workweek using the *Missel* method, a plaintiff who claims she was misclassified as exempt may seek an overtime premium of only one-half of that regular rate for the overtime hours worked that week. *Urnikis-Negro*, 616 F.3d at 678. The employer only owes one-half of the regular rate for any hours worked over the overtime threshold because the employee has already been compensated at the regular rate for the overtime hours by means of the fixed salary – as compensation for *all hours*. *Missel*, 316 U.S. at 580; *see also Urnikis-Negro*, 616 F.3d at 681 (reasoning that because the plaintiff's fixed weekly salary was "intended to compensate her not for 40 hours per week or some other fixed number of hours, but for any and all hours that she worked in a given week . . . it is *Missel* which dictates how the regular rate of pay must be calculated.").

---

[7] Since *Missel*, like the Seventh Circuit, every Court of Appeals to consider the issue has held that the "half-time" method provides the appropriate measure of damages in a misclassification case. *See Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1311 (11th Cir. 2013); *Ransom v. M. Patel Enterprises, Inc.*, 734 F.3d 377 (5th Cir. 2013); *Desmond v. PNGI Charles Town Gaming, LLC*, 630 F.3d 351, 357 (4th Cir. 2011); *Clements v. Serco, Inc.*, 530 F.3d 1224 (10th Cir. 2008); *Valerio v. Putnam Assoc.*, 173 F.3d 35 (1st Cir. 1999).

Here, LMMC's policy clearly provides that Plaintiffs' salaries compensated them for all hours worked in any given workweek in which they performed any work, regardless of the number of hours worked. Each Representative Plaintiff acknowledged she understood that she would only be paid her salary, regardless of the number of hours worked, and that she would not receive any additional compensation based on the number of hours worked. If Plaintiffs prevail on the merits of their misclassification claim, the amount of unpaid overtime should be determined according to the *Missel* method. *First*, because Plaintiffs were already compensated by their salary for all hours worked each week, their regular hourly rate should be determined by dividing their weekly salary by all hours worked each week. *Second*, one-half of that regular rate should be multiplied by the number of overtime hours Plaintiffs demonstrate they worked that week (if any) to determine the overtime compensation to be paid. *Urnikis-Negro*, 616 F.3d at 678-81.

## V.    CONCLUSION

The Supreme Court has directed that the FLSA and its implementing regulations be given a "fair reading." Under those regulations, licensed RNs are deemed to be exempt professionals, based upon the reasoned conclusion that their advanced medical training allows them to exercise professional nursing judgment. In staffing the UM unit, LMMC purposefully determined that it would require nursing professionals with this level of training because it decided that the utilization review process, LMMC's customers, and their employees, would benefit from this level of expertise. These undisputed facts compel the conclusion that LMMC's UMNs are properly classified as exempt professionals, and likewise, that the UMNs' primary duty in supporting LMMC's clients business operations includes the exercise of independent judgment and discretion. Summary judgment should be entered on LMMC's behalf and this case dismissed.

Date: July 2, 2018

s/ Andrew J. Voss
_____
Andrew J. Voss (SBN: 0241556)
avoss@littler.com
John H. Lassetter (SBN: 0389009)
jlassetter@littler.com
**LITTLER MENDELSON, P.C.**
1300 IDS Center
80 South 8th Street
Minneapolis, MN 55402.2136
Telephone: 612.630.1000

**ATTORNEYS FOR DEFENDANT
LIBERTY MUTUAL MANAGED CARE,
LLC**

Firmwide:155069833.2 058348.1037