# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

CAROL REGO,
individually and on behalf of all
others similarly situated,

        Plaintiff,

    v.                              Case No. 17-C-66

LIBERTY MUTUAL MANAGED CARE, LLC,

        Defendant.

---

## DECISION AND ORDER GRANTING IN PART PLAINTIFFS' AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

---

On January 17, 2017, Carol Rego filed a complaint against Liberty Mutual Managed Care, LLC (LMMC), alleging that she and others similarly situated[1] were entitled to overtime pay under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.*, for work they performed while employed as Utilization Management Nurses (UMN) at LMMC. LMMC denied liability, claiming that the UMN positions plaintiffs hold fall within the professional and/or administrative exemptions of the FLSA overtime provisions. Before the court are the parties' cross-motions for summary judgment and motions to seal. Both parties seek summary judgment on LMMC's administrative and professional exemption affirmative defenses. In addition, Plaintiffs seek summary judgment on LMMC's good faith defense, while LMMC seeks summary judgment on the method for calculating Plaintiffs' overtime pay rate. The court will grant the motions to seal and, for the

---

[1] On March 7, 2018, the court approved the parties' representative discovery agreement wherein each party selected two opt-in plaintiffs who serve as representative of the non-testifying opt-in plaintiffs for purposes of discovery and trial. The four representative plaintiffs are Johnette Devore, Cynthia Jaster, Tabitha Trisvan, and Tara York-Winkler.

reasons below, grant in part Plaintiffs' motion with respect to the administrative and professional exemptions and grant in part LMMC's motion with respect to the overtime pay rate.

## BACKGROUND

### A. Utilization Management Nurse Position

Managed care companies, like LMMC, employ nurses to conduct utilization reviews, which determine whether certain requested services or benefits are "medically necessary" and thus covered by insurance. LMMC employs a team of UMNs whose primary duty is to conduct these utilization reviews for its workers' compensation insurance products. In certain states, utilization reviews in workers' compensation cases are statutorily required.

Since 2009, LMMC only hires UMNs with Registered Nurse (RN) licensure, and it requires UMNs to keep their RN licenses current. LMMC prefers, but does not require, UMNs to have a bachelor's degree and three to five years of clinical experience. Although UMNs perform the bulk of LMMC's utilization reviews, LMMC sends a portion of its reviews to a third party vendor that allows only RNs to conduct the reviews. To the extent that LMMC has learned that the third party vendor has allowed a non-RN to review an LMMC file, LMMC has addressed the issue to ensure that only RNs complete LMMC reviews. LMMC has strictly enforced this RN-only principle since it hired Kristal Reich, Utilization Management Department Manager, but whether it enforced the policy prior to Reich's hiring is unclear.

LMMC's job description for the UMN role lists the following responsibilities:

1. Conducts specialized clinical review for medical necessity of Workers' Compensation (WC) claims based on state regulatory guidelines and nationally accepted protocols.
2. Utilizes clinical judgment and critical thinking to determine appropriateness of requested treatment within evidence-based clinical guidelines.

2

      3. Demonstrates self-motivation, time management and communication skills in order to meet daily production and quality expectations.

      4. Performs the UM Process within state regulated timeframes by: gathering pertinent medical information and researching the claim; applying appropriate clinical guidelines in conjunction with nursing rationale; initiating referrals for physician review if necessary; documenting accordingly per quality assurance standards; communicating decision to provider and/or claims if required.

ECF No. 54-10 at 2.

LMMC classifies UMNs as exempt from the overtime requirements of the FLSA. As a result, LMMC compensates UMNs with a salary and does not pay them overtime to the extent that they work in excess of forty hours per week. LMMC's employee handbook states: "It is Company policy to pay exempt employees their full weekly salary for any week in which they perform any work for the Company, without regard to the number of days or hours actually worked . . . ." ECF No. 48-1 at 40.

**B. Utilization Review Process**

A utilization review can occur before, during, or after the requested medical service is administered. Requests for utilization reviews can be made externally by a claimant-employee's provider-physician or internally by, for example, a claims adjuster. Authorization requests are assigned on a round-robin basis using LMMC's electronic Medical Necessity Review (MNR) system. Each UMN has a queue of reviews that they are responsible for completing. Upon assignment of an authorization request, a UMN will review the request to gain an understanding of the treatment requested. Next, the UMN will look to a guideline for the type of treatment requested. Each state in which utilization reviews are conducted designates a specific hierarchy of medical necessity guidelines to be used for utilization reviews in that state. A frequently used set of guidelines is the Official Disability Guidelines (ODG). In the absence of state-specified guidelines,

LMMC requires UMNs to use the ODG. Once the UMN identifies the appropriate guideline, the UMN compares the treatment request to the appropriate guideline. The UMN consults the patient's medical records to identify the presence or absence of various criteria identified in the guideline. In instances where a UMN is not able to certify a request due to missing documentation, the UMN may contact the medical provider to request the necessary documentation. After reviewing all relevant documents and the applicable guideline, the UMN then decides whether to certify (or approve) the request. UMNs may only certify requests that are medically necessary. If a UMN cannot certify a request, the UMN sends the request to a physician to undergo peer review. Whether certifying a request or sending it to peer review, UMNs must provide written rationale for their decision, including identification of the specific portions of the appropriate guideline(s) relied upon.

## C. Accreditation Standards

The Utilization Review Accreditation Commission (URAC) is a nonprofit organization that issues accreditations to companies that conduct utilization review services focusing on quality and confidentiality. URAC is one of the largest accreditation organizations for workers' compensation. Some states require that companies conducting utilization reviews be URAC-accredited. LMMC has been URAC-accredited since 1996, and it is re-accredited every three years. URAC requires that UMNs use written clinical review criteria, such as the medical necessity guidelines, when reviewing treatment requests and that non-certified requests be reviewed by a physician. LMMC establishes its policies and procedures related to the utilization management process to comply with URAC standards.

To achieve URAC compliance, LMMC conducts quality assurance audits of its UMNs' work product. Although URAC permits the use of Licensed Practical Nurses (LPNs) to perform

4

utilization reviews, LMMC has elected to require RN licensure to perform this function. LMMC hires only RNs in the UMN position because RNs have additional education and experience compared to LPNs and because the RN-only practice helps to differentiate LMMC in the market. Rego and all of the representative plaintiffs are licensed RNs, and each has past experience working in clinical settings. At all times relevant to this suit, Plaintiffs worked as UMNs at LMMC; Devore and Trisvan eventually obtained senior status.

## LEGAL STANDARD

Summary judgment is proper where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is genuine if a reasonable trier of fact could find in favor of the nonmoving party. *Wollenburg v. Comtech Mfg. Co.*, 201 F.3d 973, 975 (7th Cir. 2000). A fact is material only if it might affect the outcome of the case under governing law. *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 990 (7th Cir. 1993). The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: a court construes facts and inferences arising from them in favor of the party against whom the motion under consideration is made. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). When cross-motions for summary judgment are filed, "[i]n effect the judge is asked to decide the case as if there had been a bench trial in which the evidence was the depositions and other materials gathered in pretrial discovery." *Cook Inc. v. Boston Scientific Corp.*, 333 F.3d 737, 741 (7th Cir. 2003). "The existence of cross-motions for summary judgment does not, however, imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

**DISCUSSION**

The FLSA requires employers to pay employees an overtime premium rate of one and one-half times the regular rate for each hour an employee works in excess of forty hours per week. 29 U.S.C. § 207(a)(1). Exempt from this overtime pay are employees "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). The FLSA does not separately define the administrative or professional exemptions. Instead, Congress delegated the task of defining and delimiting the terms in 29 U.S.C. § 213(a)(1) to the Secretary of Labor. *See* 29 U.S.C. § 213(a)(1); 29 C.F.R. Part 541. LMMC contends that Plaintiffs are exempt from overtime pay under both the administrative and professional exemptions.

A threshold requirement for an employee to be exempt under the FLSA' professional and/or administrative exemptions is that the employee be compensated on a salary or fee basis at not less than $455 per week. 29 C.F.R. §§ 541.200(a)(1), 541.300(a)(1). An employee is considered paid on a "salary basis" if the employee "regularly receives each pay period . . . a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of work performed." § 541.602(a). Here, it is undisputed that the plaintiffs were paid over $1,100 per week, well in excess of the $455 per week minimum, and thus clearly meet the salary test. I therefore turn to other requirements of the two exemptions claimed. As an interpretive principle, courts must give FLSA exemptions a "fair reading." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).

**A. Administrative Exemption**

To qualify as administratively exempt: (1) the employee must meet the salary requirement; (2) the employee's primary duty must consist of the performance of office or non-manual work

6

directly related to the management or general business operations of the employer or the employer's customers; and (3) the employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200(a). An employee's "primary duty" is "the principal, main, major or most important duty that the employee performs." § 541.700(a).

### 1. Directly Related to Management or General Business Operations of LMMC or Its Customers

The phrase "directly related to the management or general business operations" refers to "the type of work performed by the employee." 29 C.F.R. § 541.201(a). To meet this requirement, an employee must "perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." *Id.* Examples of work directly related to management or general business operations include "functional" areas such as insurance, safety and health, employee benefits, and legal and regulatory compliance. § 541.201(b). The management or general business operations at issue may be those of the employer or the employer's customers. § 541.201(c).

Plaintiffs argue that UMNs produce the services that LMMC provides to the market and that utilization reviews are not functional work that "must be performed no matter what the business produces" such that UMN work can be considered administrative. *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 535 (2d Cir. 2009). Plaintiffs note that, as a managed care company, LMMC is in the business of providing its customers with determinations of whether requested treatments are medically necessary, and that UMNs carry out this essential function. *See Schaefer-LaRose v. Eli*

7

*Lilly & Co.*, 679 F.3d 560, 574 (7th Cir. 2012) ("[W]hen an employee is engaged in the core function of a business, his or her task is not properly categorized as administrative."). LMMC counters that UMN work directly relates to several of the functional areas identified in § 541.201(b) with respect to LMMC's customers. LMMC argues that UMNs are "directly analogous" to the claims adjusters in *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865 (7th Cir. 2008) who were found to have performed an administrative function.

The court agrees with Plaintiffs that their performance of utilization reviews does not directly relate to the management or general business operations of LMMC. As a managed care company, one of LMMC's core functions is to determine whether treatment requests are medically necessary under applicable guidelines by conducting utilization reviews, and the primary duty of LMMC UMNs is to conduct these reviews. Because the work of UMNs is essential to LMMC's core function, UMN work cannot be properly considered administrative. *See Schaefer-LaRose*, 679 F.3d at 574. LMMC does not offer support for its contention that Plaintiffs' work directly relates to the administrative operations of LMMC. Instead, LMMC focuses on the relation of Plaintiff's work to the business operations of LMMC's customers.

The court is not persuaded that Plaintiffs' UMN work directly relates to the management or general business operations of LMMC's customers. As an initial matter, LMMC's reliance on *Roe-Midgett* is misplaced. In *Roe-Midgett*, the Seventh Circuit held that the work of insurance claim adjusters claim was directly related to the administrative operations of the employer's customers because the adjusters were "service providers" providing for "the administration of insurance claims." 512 F.3d at 872–73; *see also Withrow v. Sedgwick Claims Mgmt. Serv., Inc.*, 841 F. Supp. 2d 972, 980 (S.D. W. Va. 2012) (relying on *Roe-Midgett* to hold the same). *Roe-Midgett* and

*Withrow* are distinguishable from this case because Plaintiffs' work as UMNs at LMMC differed from claims adjustment work. Not only does LMMC employ UMNs and claims adjusters as distinct positions, but also UMNs do not perform the type of work that the adjusters performed in *Roe-Midgett* and *Withrow*. The claims adjusters in *Roe-Midgett* investigated, adjusted, and settled claims with minimal oversight, and they spent most of their time in the field representing the "face" of their employer. 512 F.3d at 871. Likewise, the claims adjusters in *Withrow* communicated with claimants, processed treatment requests, assisted in settling claims, set and reevaluated the reserve for each claim, and managed litigation. 841 F. Supp. 2d at 974.

Unlike the claims adjusters in *Roe-Midgett* and *Withrow*, UMNs at LMMC do not manage all aspects of a claim. Aside from "evaluating and making recommendations regarding coverage of claims" based on pre-set guidelines, UMNs do not perform any of the duties in 29 C.F.R. § 541.203(a) that characterize the work of claims adjusters who "generally" meet the duties requirements of the administrative exemption. The duties of LMMC UMNs are narrow: they receive a treatment request, identify a guideline, and then decide whether the treatment is medically necessary based on the guideline and a review of patient records. This work is distinct from that of claims adjusters. *See Clark v. Centene Co. of Tex., L.P.*, 44 F. Supp. 3d 674, 683–84 (W.D. Tex. 2014).

That UMNs perform work the ultimate consequence of which may impact the employee benefits and health of the employees of LMMC's customers does not automatically satisfy the "directly related" prong. *See* 29 C.F.R. § 541.201(b) (listing health and employee benefits as functional areas that relate to administrative operations); *Clark v. J.M. Benson Co.*, 789 F.2d 282, 287 (4th Cir. 1986) (finding the nature rather than the ultimate consequence of an employee's work

to be critical in the administrative operations inquiry).  Plaintiffs' work of certifying or sending to peer review treatment requests is more similar to work performed on a manufacturing production line than work servicing the operations of a business.  *See* 29 C.F.R. § 541.201(a).  UMN work does not develop, review, evaluate, or otherwise directly impact the business policies or strategies of LMMC's customers, and such work falls outside the types of administrative work that the administrative exemption contemplates.  *See Calderon v. GEICO Gen. Ins., Co.*, 809 F.3d 111, 124 (4th Cir. 2015); *Desmond v. PNGI Charles Town Gaming, LLC*, 564 F.3d 688, 694 (4th Cir. 2009); *Haywood v. North Am. Van Lines, Inc.*, 121 F.3d 1066, 1072 (7th Cir. 1997), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013); Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,138 (Apr. 23, 2004) (codified at 29 C.F.R. pt. 541) (listing examples of work "servicing" a business under the administration exemption).  Because Plaintiffs' work does not directly relate to LMMC or LMMC's customers' administrative operations, this prong is not satisfied and the administrative exemption does not apply.

### 2. Exercise of Discretion and Independent Judgment on Matters of Significance

The second prong of the primary duty test requires that an employee's primary duty involve "the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a)(3).  "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."  § 541.202(a).  "Matters of significance" refers to "the level of importance or consequence of the work performed."  *Id.*  This inquiry involves the consideration of a multitude of factors, though courts rarely engage in a factor-by-factor analysis.

*See* 29 C.F.R. § 541.202(b); *Schaefer-LaRose*, 679 F.3d at 582 ("The list of factors is not a checklist; it is a guide."). "The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." § 541.202(e); *see also* 29 C.F.R. § 541.70. "The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion or independent judgment." § 541.202(c).

Plaintiffs urge the court to follow the Fifth Circuit's reasoning in *Clark v. Centene Company of Texas, LP* to find that LMMC UMNs' primary duty does not involve the exercise of discretion and independent judgment. 656 F. App'x 688 (5th Cir. 2016). Plaintiffs argue that, by design, LMMC's utilization review process eliminates discretion. LMMC points the court toward the reasoning in *Roe-Midgett*, *Rieve v. Coventry Health Care, Inc.*, and *Locke v. American Bankers Insurance Company of Florida* and argues that Plaintiffs have admitted that they exercised discretion and independent judgment in their UMN role. 512 F.3d 865 (7th Cir. 2008); 870 F. Supp. 2d 856 (C.D. Cal. 2012); No. 1:12-cv-01430-MJS, 2014 WL 2091346 (E.D. Cal. May 19, 2014). Contrary to Plaintiffs' characterization, LMMC argues that Plaintiffs had "broad discretion" in conducting utilization reviews.

Although LMMC's failure to satisfy the "directly related" prong independently defeats its administrative exemption defense, the defense is doubly defeated because Plaintiffs do not exercise discretion and independent judgment as UMNs at LMMC. The court finds the Fifth Circuit's reasoning in *Clark* persuasive. In *Clark*, the Fifth Circuit affirmed the district court's grant of summary judgment for plaintiffs on the administrative and professional exemptions to the FLSA

11

overtime requirements.  656 F. App'x at 689.  Like Plaintiffs here, the plaintiffs in *Clark* performed utilization reviews, meaning they were "expected to gather and examine admissions or health provider requests through on-site, telephonic, or internet review of medical information, and compare this information to guidelines made up of 'nationally recognized criteria to determine medical necessity of services requested.'"  *Id.*  The Fifth Circuit's conclusion that "examining medical information and applying it to utilization review guidelines" is inspector-type work under 29 U.S.C. § 541.203(g), which involves "specialized work along standardized lines involving well-established techniques and procedures, which may have been catalogued and described in manuals or other sources," equally applies here.  *Id.* at 692.

LMMC's attempt to distinguish *Clark* is unpersuasive.  First, LMMC's observation that *Clark* was decided on the basis of a narrow, now-superseded standard for construing FLSA exemptions does not make the *Clark* court's reasoning any less applicable.  Second, LMMC's claim that Plaintiffs are somehow different than the plaintiffs in *Clark* because UMN work at LMMC requires more than "connecting the dots" finds little support in the record.  Trisvan described UMN work at LMMC as follows: "you just applied the information that was in front of you . . . We compared the information to the guidelines."  Trisvan Dep., ECF No. 48-1, at 40:9–10.  When asked about her decision making process, Trisvan testified: "ODG tells me what I should say, what I should be finding, what the clinical notes should have in it, and if that language is not in the clinical notes, ODG tells me it's not medically necessary."  *Id.* at 86:14–18.  That Plaintiffs generally agree that LMMC's UMN job description, which utilizes words like "clinical judgment" and "critical thinking," accurately describes their work does not carry the day in the discretion and independent judgment inquiry because Plaintiffs' actual work, rather than the employer's description of the work,

12

is what is relevant here.  For instance, although Jaster described "review[ing] the tactic or procedure or medication that's been proposed to determine whether it fits within the guidelines" as exercising "judgment," the label Jaster assigned her work is irrelevant to the fact the work itself reflects inspector-type work.  *See* Jaster Dep., ECF No. 48-1, at 51:4–18.

LMMC's reliance on *Roe-Midgett* to argue that Plaintiffs exercised discretion and independent judgment is similarly unpersuasive.  Although "independent judgment is not foreclosed by the fact that an employee's work is performed in accordance with strict guidelines," *Roe-Midgett*, 512 F.3d at 875, Plaintiffs' UMN work does not involve such judgment.  In *Roe-Midgett*, the Seventh Circuit held that the claims adjusters' work involved sufficient discretion and independent judgment to fall within the administrative exemption because the adjusters "spen[t] most of their time in the field investigating, estimating, and settling auto damage claims—unsupervised and up to their \$12,000 limit of authority."  *Id.* at 874–75.  The adjusters, who "do far more than just appraise damage," were able to "deviate from the adjusting manual provided they document their reasons for doing so" and to override software that provided preliminary estimates.  *Id.* at 875.  Unlike the adjusters in *Roe-Midgett*, Plaintiffs' UMN work better resembles "mere appraise[ment]." *Id.*  Plaintiffs identified a specific guideline, reviewed medical records to see if the applicable guideline's criteria were present, and either certified or submitted to peer review a treatment request.  To the extent Plaintiffs deviated from the guidelines, they did so rarely.  Trisvan testified that in a case where a guideline allowed ten physical therapy sessions but a treatment request asked for twelve, she could certify the request because "[LMMC] said it was too costly to send it to peer review."  Trisvan Dep., ECF No. 48-1, at 22:25–23:19.  In cases where the treatment request did not match the guideline, Plaintiffs could not "negotiate" like claims adjusters.  Devore testified that, in

such a case, she could call the medical provider, tell the provider about the guideline mismatch, and then ask if the provider wanted to modify its request to match the guideline. Devore Dep., ECF No. 48-1, at 13:9–18. According to York-Winkler, if the provider did not modify the request to match the guideline, then the request would be sent to peer review. York-Winkler Dep., ECF No. 64-6, at 80:22–81:8.

*Rieve v. Coventry Health Care, Inc.*, 870 F. Supp. 2d 856 (C.D. Cal. 2012), is also inapposite. In *Rieve*, the plaintiff RN was a case manager whose job duties were "to provide ongoing, day-to-day case management services for Defendants' customers by documenting the costs of care, preparing reports regarding a plan of care, and identifying and implementing medical services to meet the needs of Defendants' customers." *Id.* at 860. The court noted that "even though Plaintiff existed in a hierarchy, she was clearly still required to exercise independent judgment and discretion in the course of her duties. Like a registered nurse in practice, she interacted with physicians and patients and provided skilled advice, despite the fact that she did not have the authority to order or alter any course of treatment herself." *Id.* at 864. Here, by contrast, Plaintiffs did not spend the majority of their time communicating with doctors, patients, and claims adjusters in order to understand the patients' conditions and to determine whether the care being provided was appropriate. *See id.* at 865. Plaintiffs also never educated patients about their potential conditions. *Id. Rieve* is therefore not instructive.

The same is true of *Locke*. In finding that claims adjusters exercised discretion and independent judgment in *Locke*, the court relied on the fact that the directives the adjusters were to follow did not dictate "how to evaluate coverage and damage claims, negotiate settlements and communicate with individual insureds in the states of mind and circumstances unique to each

14

claim." 2014 WL 2091346, at *11. The *Locke* court also noted that the adjusters' judgment, wisdom, and training governed their responses. *Id.* Here, Plaintiffs relied on guidelines rather than their own judgment, wisdom, and training to determine whether treatment requests were medically necessary. The guidelines specifically delineate the requisite criteria that must be present in medical records in order for a UMN to certify a request and leave no room for a UMN to take their own path in evaluating and negotiating claims. *Locke* is thus unpersuasive.

Because the court finds that Plaintiffs' primary duty as LMMC UMNs was not directly related to the management or general business operations of LMMC or LMMC's customers and did not involve the exercise of discretion or independent judgment, the court need not analyze whether Plaintiffs' work involved "matters of significance," and summary judgment in Plaintiffs' favor on the administrative exemption is appropriate.

**B. Learned Professional Exemption**

To qualify for the learned professional exemption, (1) the employee's primary duty must be the performance of work requiring advanced knowledge; (2) the advanced knowledge must be in a field of science or learning; and (3) the advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction. 29 C.F.R. § 541.301(a). Registered nurses "generally meet the duties requirements for the learned professional exemption." § 541.301(e)(2). "Licensed practical nurses and other similar health care employees, however, generally do not qualify as exempt learned professionals because possession of a specialized advanced academic degree is not a standard prerequisite for entry into such occupations." *Id.*

15

### 1. Work Requiring Advanced Knowledge

"Work requiring advanced knowledge" means work that is "predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work." 29 C.F.R. § 541.301(b). "An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances." *Id.*

LMMC argues that because registered nurses generally satisfy the duties requirements for the learned professional exemption, § 541.301(e)(2), and because LMMC requires that all UMNs have RN licensure, Plaintiffs should be classified as exempt. Citing *Crowe v. ExamWorks, Inc.*, 136 F. Supp. 3d 16 (D. Mass. 2015), LMMC argues further that, regardless of the express language of § 541.301(e)(2), Plaintiffs' primary duty of performing utilization reviews required the exercise of advanced nursing knowledge and judgment. Plaintiffs, on the other hand, argue that RN licensure is not dispositive on the question of professional exemption. Plaintiffs' insist, instead, that their duties as they were actually performed are the proper target of analysis and that performing UMN duties did not involve the exercise of advanced knowledge.

Plaintiffs' work conducting utilization reviews did not require advanced knowledge. For the reasons previously explained, Plaintiffs' work did not involve "the consistent exercise of discretion and judgment," meaning they did not, by definition, engage in work requiring advanced knowledge. *See* 29 C.F.R. § 541.301(b); *see also Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 536–38 (7th Cir. 1999), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013) (treating the discretion and independent judgment analysis of one exemption as dispositive

16

in the other).  A more proper characterization of Plaintiffs' duties is the "performance of routine mental . . . work."  § 541.301(b).  Plaintiffs are correct that the proper focus of a court's examination of whether work requires "advanced knowledge" is the work as it is actually performed.  *See Piscone*, 171 F.3d at 545 (citing *Dybach v. Fla. Dep't of Corr.*, 942 F.2d 1562, 1565 (11th Cir. 1991)) ("[T]he determinative factor in analyzing whether an employee falls within [the advanced knowledge] prong is the job requirements rather than the education the employee received . . . .").  Thus, the fact that all LMMC UMNs have RN licenses does not mean that the knowledge acquired in obtaining such licenses is used in performing utilization reviews.  Indeed, Plaintiffs repeatedly testified in their depositions that their nursing backgrounds, while helpful for understanding terminology in medical records, was not required to perform utilization reviews given the specificity of the guidelines they were required to follow.  *See* Rego Dep., ECF No. 48-1, at 48:24–51:2; Devore Dep., ECF No. 48-1, at 16:9–10; Trisvan Dep., ECF No. 48-1, at 85:24–86:18.

LMMC insists that Plaintiffs' work involved using advanced knowledge because they employed "nursing rationale" when conducting utilization reviews.  Reflecting on the use of nursing judgment in the UMN role, Devore testified:

> As a utilization review nurse, we have to stay objective.  That is the—one of the key things in utilization review is staying objective, looking to the guidelines and staying objective to the review.  If you get—start using too much nursing judgment, then you can get too involved, and which I had problems with that moving from case management into the utilization review role because I was using more nursing judgment in the nurse—as a case manager and then moved into the UR role.

Devore Dep., ECF No. 48-1, at 37:13–38:1.  To the extent Devore admitted to using "nursing judgment" as a UMN, it is unclear what she understood such judgment to mean in light of her testimony that nursing judgment is ingrained in her, that she uses nursing judgment to some degree

17

in everything she does, and that a nursing degree is likely not necessary to perform the UMN role. *Id.* at 16:9–10, 38:9, 40:22–24. Indeed, to the extent Devore described utilization review in the abstract, she emphasized the need to remain objective, follow the guidelines, and avoid using nursing judgment. Other deposition testimony from Plaintiffs regarding their use of nursing rationale, clinical judgment, or critical thinking is similarly inconsistent. That Plaintiffs may use the words "nursing rationale" or "clinical judgment" when speaking about their work does not transform the nature of the work itself. To allow the use of such terminology to trigger an exemption without a close look at the job duties would undermine the purpose of the FLSA maximum hours provision. As the Fifth Circuit explained in *Clark*, Plaintiffs performed inspector-type work under 29 U.S.C. § 541.203(g), and, for the purposes of the learned professional exemption, their work is best described as "routine mental work" rather than work "requiring the consistent exercise of discretion and judgment." *See* 29 C.F.R. § 541.301(b).

Ultimately, the court finds *Crowe*, upon which LMMC places great reliance, unpersuasive. In *Crowe*, the court held that "[t]he [utilization review nurse] plaintiffs employ advanced, technical knowledge in the medical field to exercise independent judgment in determining whether a particular treatment request for a particular patient satisfied the applicable guidelines." 136 F. Supp. 3d at 31. In support of this decision, the *Crowe* court cited a plaintiff nurse's testimony about what she would look for in a case file requesting a physical therapy evaluation. The testimony reads:

> I would expect to see a diagnosis. We already get the date of injury from the adjuster, and that is the most accurate date of injury. We would expect to see—okay, he has a decreased range of motion, say, in his lumbar spine. He has muscle spasm in that area. Let's see. Possibly they've already done an x-ray or an MRI. Are there any herniated disks? Whatever. It depends upon the timeframe also for that.

18

*Id.* The *Crowe* court noted that the testimony "demonstrates the way in which [utilization review nurses] apply their medical knowledge." *Id.* Based on this testimony and on three factually distinguishable cases, the *Crowe* court found the advanced knowledge prong satisfied. *See id.* at 31–34. Not only are the cases relied upon distinguishable, but also the testimony fails to demonstrate use of advanced knowledge. The testimony reflects a list of expectations about what a case file might show, but it does not "demonstrate" the use of advanced knowledge. To the extent the nurse lists patient symptoms typical in physical therapy cases, such information can be gathered from repeated encounters with physical therapy cases and does not imply use of advanced knowledge. It should also be noted that in *Crowe* the court ultimately denied summary judgment to the employer on the ground that a factual dispute existed as to whether the job of a UMN "requires prolonged, specialized instruction." *Id.* at 36. It is to that prong of the professional exemption that I now turn.

### 2. Customarily Acquired By a Prolonged Course of Specialized Intellectual Instruction[2]

Like the administrative exemption, all prongs of the learned professional exemption must be met to exempt an employee. Because the court determined that Plaintiffs' primary duty as UMNs was not the performance of work requiring advanced knowledge, this exemption is not satisfied. Even if the court found that Plaintiffs' work required advanced knowledge, such knowledge was not customarily acquired by a prolonged course of specialized intellectual instruction. "The phrase 'customarily acquired by a prolonged course of specialized intellectual instruction' restricts the

---

[2] Plaintiffs do not argue that the second element of the learned professional exemption—that the advanced knowledge be in a field of science or learning—is not met, so it will be treated as satisfied.

exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession." 29 C.F.R. § 541.301(d). "The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree." *Id.* The learned professional exemption "does not apply to occupations in which most employees have acquired their skill by experience rather than by advanced specialized intellectual instruction." *Id.* While registered nurses generally meet the duties requirements for the learned professional exemption, licensed practical nurses and other similar health care employees do not. § 541.301(e)(2).

LMMC argues that Plaintiffs' advanced knowledge was customarily acquired by a prolonged course of specialized intellectual instruction because § 541.301(e)(2) recognizes that registered nurses generally satisfy the exemption and because LMMC requires that all of its UMNs and all third-party UMNS performing LMMC utilization reviews have RN licenses. This requirement, LMMC contends, carries with it the expectation that LMMC UMNs will perform higher quality utilization reviews that rely on their RN backgrounds. Plaintiffs argue that although LMMC maintains an RN-only policy, LMMC cannot demonstrate that utilization review work itself requires RN-level knowledge. Plaintiffs assert that, in fact, utilization review work only requires LPN-level knowledge, meaning Plaintiffs cannot be said to have used advanced knowledge customarily acquired by a prolonged course of specialized intellectual instruction under § 541.301(e)(2). The parties agree that courts should examine the minimum requirements of the UMN job in assessing whether the specialized instruction prong is met, but they disagree on what requirements are relevant. LMMC insists that the employer's requirements are controlling, while Plaintiffs contend that the de facto requirements necessary to perform the job are controlling. LMMC thus insists that

its RN-only policy carries the day, while Plaintiffs insist that this prong is not satisfied because LPNs can perform utilization reviews.

The court agrees with Plaintiffs' interpretation. The Department of Labor's regulations makes clear that the learned professional exemption is reserved for professions "where specialized academic training is a *standard* prerequisite for entrance into the profession." 29 C.F.R. § 541.301(d) (emphasis added); *Raimondi v. Cent. DuPage Hosp.*, No. 15C7780, 2017 WL 1178513, at *4 (N.D. Ill. Mar. 30, 2017) ("Under the regulations, however, the key question is whether [the employee's] primary duties, as she actually performed them, required use of advanced knowledge acquired through a course of specialized instruction."); *Kadden v. VisuaLex, LLC*, 910 F. Supp. 2d 523, 534 (S.D.N.Y. 2012); *see also* 29 C.F.R. § 541.2 ("The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and *duties* meet the requirements of the regulations in this part.") (emphasis added). The standard prerequisite for utilization review work, as judged from the accreditation requirements of URAC, which is one of the largest accreditation organizations for companies performing utilization reviews, is LPN-level credentials. That LMMC requires UMNs to have RN licenses does not transform the underlying utilization review work or the requisites necessary to perform such work. Adopting LMMC's logic would permit employers to exempt their employees from overtime by inflating job requirements where the duties of the job do not require the employer's arbitrary prerequisites. *See Pippins v. KPMG, LLP*, 759 F.3d 235, 251 (2d Cir. 2014) ("[P]laintiffs are right on the law: if journalists are not 'learned professionals' because they acquire their skills on the job, a newspaper cannot deprive them of overtime pay by arbitrarily setting a PhD in literary studies as a condition of hiring.") (internal citations omitted); *Raimondi*, 2017 WL 1178513, at *4 ("[T]he fact that the

hospital sought and hired a registered nurse does not carry the day if [the employee] did not actually perform work that required the use of her specialized knowledge as a nurse.").

Because Plaintiffs' primary duty as LMMC UMNs did not require the performance of work requiring advanced knowledge and because the advanced knowledge alleged was not customarily acquired by a prolonged course of specialized intellectual instruction, summary judgment in Plaintiffs' favor on the learned professional exemption is appropriate.

## C. Section 260 Good Faith Defense

An employer who violates the FLSA's overtime compensation provision is liable to the employees affected in the amount of unpaid overtime compensation "and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). A court has discretion to reduce or deny an award of liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act." 29 U.S.C. § 260. "The employer bears the burden of proving both good faith and reasonable belief," but "the burden is a difficult one, with double damages being the norm and single damages the exception." *Shea v. Galaxie Lumber & Constr. Co.*, 152 F.3d 729, 732 (7th Cir. 1998); *Chao v. Barbeque Ventures, LLC*, 547 F.3d 938, 941–42 (8th Cir. 2008) (citing *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999)). To meet the good faith defense's subjective standard, the employer "must show that he took affirmative steps to ascertain the [FLSA]'s requirements." *Chao*, 547 F.3d at 942 (quoting *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 908 (3d Cir. 1991)). The employer must also prove that its position was objectively reasonable. *Id.*

LMMC argues that Plaintiffs' summary judgment motion on LMMC's good faith defense is premature given that no finding of liability under the FLSA has occurred and that a triable issue exists as to whether LMMC's burden is met given that it conducted an analysis of the UMN position in 2014, which LMMC contends involved a compensation specialist with knowledge and training related to the FLSA's overtime requirements. Plaintiffs essentially make a specificity argument, claiming that LMMC's vague reference to its 2014 UMN position analysis, without more, fails to meet LMMC's "substantial burden" under the good faith defense. *See Jackson v. Go-Tane Servs., Inc.*, 56 F. App'x 267, 273 (7th Cir. 2003). Plaintiffs argue further that LMMC cannot present evidence about its decision making process, materials relied upon, or advice considered.

A genuine issue of material fact exists as to whether LMMC satisfies its good faith defense. LMMC's assertion that, in 2014, it relied upon a compensation specialist with knowledge and training related to the FLSA's overtime requirements to conduct an analysis of the UMN position creates a triable issue as to whether LMMC has met its burden under the good faith defense. *See Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 920 (9th Cir. 2003); *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 841 (6th Cir. 2002); *Samson v. Apollo Res., Inc.*, 242 F.3d 629, 641 (5th Cir. 2001). The court is satisfied at this stage that LMMC's showing of its 2014 analysis "go[es] beyond the pleadings" to demonstrate that there exists evidence upon which a verdict could be entered in its favor on the good faith defense. *See Modrowski v. Pigatto*, 712 F.3d 1166, 1168–69 (7th Cir. 2013). Summary judgment on LMMC's good faith defense is therefore inappropriate.

**D. Overtime Pay Rate**

While the FLSA normally entitles a non-exempt employee to an overtime pay rate of one and one-half times his ordinary rate for all hours worked in excess of forty hours per week, an

exception to this rule exists in misclassification cases. *See* 29 U.S.C. § 207(a)(1); *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 580 (1942); *Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 670–71, 681–83 (7th Cir. 2010). Under *Missel*, if a misclassified employee who is salaried has not otherwise agreed to a specific hourly rate, the employee's regular rate of pay equals the fixed weekly wage divided by the hours actually worked that week, including hours worked in excess of forty hours. 316 U.S. at 580 n.16. Such a misclassified employee is entitled to an overtime premium pay rate of one-half his regular rate, as calculated above, for all hours worked in excess of forty hours per week. *Urnikis-Negro*, 616 F.3d at 681. The employer owes this one-half rate because the employee's salary was intended to compensate the employee for all hours worked each week. *Id.* Whether the employer and employee had a "clear mutual understanding" or otherwise agreed that the employee's weekly salary was meant to cover all hours worked informs this analysis. *Id.* at 680–81. This agreement need not be evidenced in writing, but may be inferred from the parties' conduct. *Id.* at 681 n.8.

The *Missel* method is applicable here, as Plaintiffs understood that their salaries compensated them for all hours worked. Rego testified that she understood that she would not be paid overtime and that her salary was meant to cover all hours she worked. Rego Dep., ECF No. 48-1, at 44:9–46:6. Similarly, Trisvan testified that she was paid the same salary no matter how many hours she worked each week and that LMMC had a no-overtime policy. Trisvan Dep., ECF No. 48-1, at 29:11–31:11. York-Winkler testified that, aside from periodic bonuses based on yearly evaluations and LMMC's performance, the only compensation she was owed for her UMN work was her salary. York-Winkler Dep., ECF No. 48-1, at 31:2–32:10. Devore testified that she understood that she was a salaried, exempt employee, although she did not expect to work ten to

24

twelve hours a day.  Devore Dep., ECF No. 48-1, at 20:7–18.  Jaster testified that she would receive the same fixed salary and that she also expected to receive merit and cost-of-living raises, additional "comp time," and other "awards" that were sometimes monetary.  Jaster Dep., ECF No. 48-1, at 11:6–12:24.  This testimony sufficiently demonstrates that Plaintiffs understood their salaries to compensate them for all hours worked.

Plaintiffs' testimony about receiving compensation beyond their salaries (e.g. bonuses, raises, awards) and about their hours expectations does not create a triable issue of fact on the question of whether they understood their salaries to compensate them for all hours worked. Plaintiffs did not testify that any additional compensation they received was tied to overtime hours. Rather, regarding overtime, several of the plaintiffs acknowledged that they were exempt from overtime and that their salaries compensated them for all hours worked.  That some of the plaintiffs expected to work fewer or a fixed number of hours is unavailing.  *See Urnikis-Negro*, 616 F.3d at 680–81 (affirming the district court's finding that the employer and employee had a mutual understanding that the employee's salary compensated her for all hours worked where she expected to work but routinely worked more than forty hours per week); *Ransom v. M. Patel Enters., Inc.*, 734 F.3d 377, 386 (5th Cir. 2013) (finding that employees were aware that their salaries compensated them for all hours worked when their course of conduct showed that they often worked more, but sometimes fewer than, the roughly fixed hours they were told they would work).

Because Plaintiffs understood that their salaries compensated them for all hours worked, any overtime compensation owed to them must be calculated using the *Missel* method.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for summary judgment (ECF No. 50) is **GRANTED in part** with respect to LMMC's administrative and professional exemption affirmative defenses and otherwise denied. LMMC's motion for summary judgment (ECF No. 45) is **GRANTED in part** with respect to the method for calculating Plaintiffs' overtime pay rate and otherwise denied. Plaintiffs' motion to restrict document (ECF No. 41) is **GRANTED**. LMMC's motions to restrict documents (ECF Nos. 43 and 56) are **GRANTED**.

Dated this   11th   day of March, 2019.

 s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court